The final case for today, this is not Groundhog Day. These are unique people with unique interests and although they have similar legal arguments. And so let's, this is 20-23-503-99, Sachindra Khanna-Koppula and Sindhu Pinagonda, help me on that one. I call her Mrs. Koppula. Okay. Versus Jaddou. Thank you, Honors. I really do appreciate you giving each set of clients time. It's intangibly but incredibly meaningful. That said, I'm happy to answer any questions you all may have, but I don't have anything else. They have no factual distinctions that you want to point out as to these people? No, Your Honor. Let me talk to that. So all of these folks, again, October of 2020, the Visa Bulletin pushed forward for Indian nationals in certain employment-based categories. So they were visas immediately available. So they all filed for adjustment of status. It retrogressed, moved backwards, moved forwards, moved backwards, moved forwards. In the summer of 2022, these folks filed unreasonable delay cases because they were current and they didn't want to miss the opportunity. And that's how I think all of these cases, all three of these cases started, unreasonable delay cases. I think out of, let's say, 15 I filed in Texas in different districts, these are the only three that it didn't get decisions on. And the priority dates in all of those were all over the place. So the other ones are getting decisions and they're moving forward. Well, they get decisions when we move the case out. We appreciate it. The government made a decision. They got green cards. That case is over. These people might get green cards perhaps. I'm not saying that they're entitled before all of these cases around the country are resolved. If it's in March that they're on and they're trying to get to the fall. To move forward by one month on the visa bulletin is likely to take months if not years. So it could take years to move them up. Correct. I do not expect Mr. Coppola to get a green card during the duration of his lawsuit unless a court orders the government to. The backlog is significant. But to the point, I think one of my colleagues mentioned, well, they had two requests for evidence. Requests for evidence make it sound like you've done something wrong. When you file for adjustment of status, you have to send in a civil surgeon report. So you have to go to basically a minute clinic and they confirm you've done your vaccinations. They're only good for two years. Those two requests for evidence were updated medicals. It's not substantive. And I think there was a change because they required a COVID vaccination or something like that. But these are not checking in to make sure they're still working. Questions about their admissibility. These are rote, routine things that the government is requiring because of the delays. Because of the delays. And so, again, I don't want to take up much more of your time. But I do think the facts here are somewhat heartbreaking. And, again, not all immigration cases have heartbreaking facts. I kind of disagree with that. But sometimes heartbreaking facts are nonetheless not adjudicated. We are not here to – we are not Solomon, none of us. And we don't just decide things. We have to follow the rule of law. I completely agree, Your Honor. And I think if I was going to sum up the appellee's arguments here is that they have significant policy concerns. But as the Supreme Court has said, policy concerns cannot trump the best interpretation of the statutory text. And at heart, this is a great admin law test. Text, structure, history. I think we win on the text. I think we win on the structure. We don't even have to get to history. But all of those three things point to an intent from Congress, an expressent – well, I'm sorry, an intent of Congress to say, hey, when they file for adjustment of status, that means they have a visa immediately available. And once you're there, you have certainty. We're going to get you a green card. It might take us time. But any movement of this visa bulletin isn't going to impact you. Because when you sent in your adjustment of status application, by definition, you had a visa immediately available, and we're going to honor that. And just to, I guess, put a bow on it, that argument that you're making really keys on the language in 1255A. Yes, Your Honor. That's where you're getting this requirement. I just want to understand the – 100 percent. It's compelled by the text. Yes, and I – Immediately available to him. Well, and I think, you know, even under Chevron, assuming that's going to last, right, to determine the language or whether there's gaps in the statute, we'd use the traditional canons of interpretation – text, structure, history. And I know there's academic disagreement over that, but the Fifth Circuit has said that. Even in Chevron Step 1, we go text, structure, history to determine if Congress has spoken to this exact issue. Again, Congress has spoken. Congress spoke to this particular issue in 1255A. Yes, Your Honor. Thank you. Just a quick, as you're walking away, what's your view on why things are the way they are? Why are the delays what they are? Is it budgetary, congressional funding, lack of personnel, a lot of moving parts? Just curious as to your point of view. You know, this has been a policy the agencies – agencies, and I do mean legacy INS – have had in place for 45 years. I don't think it mattered for the first 35 years because we didn't have this backlog. But with the introduction of the H-1B and the increase in cap numbers, as well as a statute called AQUIA and AC-21 that provided more extensions to people on H-1Bs, you now have this relatively recent phenomena of the lifetime H-1B. Because if you have an approved immigrant visa that's not immediately available, you can have indefinite H-1B extensions for three years at a time. And from 2010 forward is really the first time in our – in the INA's history that you've created – or for whatever reason, and I'm sorry that that's what you were asking, what's the reason – 140,000 people in this backlog. And so they're – what's likely going to happen, frankly, is these folks have been living here for 19 years. They have children who are U.S. citizens. And once those kids hit 21, they can petition for their parents. And so a lot of my clients, unfortunately, that's how they're holding out hope. They'll be on H-1B until then, and then they'll acquire permanent residency through a family-based system. And they're immediate relatives under the law, so there's no cap. But I do think the agency's trying. I don't think there's anything nefarious. And I don't think a decision in favor of my three sets of clients here would be as – what's the word I'm looking for – be as life-changing as the agency claims. It would just mean, I think in the short term, the immediately available date wouldn't move forward until they took care of all of these folks, which would decrease the chances for wastage. And then in four or five years, hopefully when they get through that backlog, you're going to see a huge progression. And so you're not going to have these class of people who are H-1Bs for their lifetime. I think in the short run, there's not much progress. I think in the long run, it's a huge step forward. Thank you, Your Honors. Thank you. Hello, Your Honors, once again. Can I ask you real quick? Yes. Do you believe that the agency has the power – I know you believe the court doesn't have the power – but do you believe the agency has the power to do exactly what we've just been listening to by saying we're going to catch up on all the backlog and we're going to prioritize the backlog and work that now instead of moving forward until we get that done and really focus on that? That's within the discretion of the agency to do right now, isn't it? Absolutely. The agency can certainly hunker down and focus on the green card backlog. And back in 2022, it certainly did that and it issued all of the EB-2 and EB-3 visas that were available at the time. The thing about that is time runs out and visas run out. And so even though the agency can work as hard as they can and can work as quickly as possible, there are still going to be limitations on what they can do. And I'd like to address counsel's representation in the briefing and before you all today that this is – he's really only asking for this court to mandate the agency to just adjudicate and approve his client's applications. As Judge Duncan noted, this is happening all over the country. And as my colleague noted, we're all over the place with these same challenges. So in effect, this is a programmatic challenge to the way USCIS adjudicates adjustment of status applications and the way that the Department of State issues immigrant visas to those applicants. So under Norton, programmatic challenges are inappropriate under the APA. And as I noted, the – Well, is it really programmatic or is it just he's got a bunch of clients and so – and he'll probably have a bunch more clients if he were to prevail in any of these. So I don't know that that renders it programmatic. I think he's only asking for relief. I think you're saying that in effect it would be, but it's not really a programmatic challenge. In effect, it would be widespread and would effectuate a widespread change as to how the agencies do things. And I'd like to note one more thing for you all, that Congress has not wavered in what its requirements are for adjustment in the last 50 years. So really, if – and the Ninth Circuit in the Bavaria case noted, I mean, this is really a ratification of the way that the agency is doing things. And if Congress believed that this was wrong, it could have changed the statute again. And as we saw in 1960 and 1976, Congress did change the statute. So I think that though the history of the legislative history or the history of how the statute has played out isn't the end all, it's really illustrative as to how Congress views this program and the deference that it shows and the discretion that it has given the Secretary of Homeland Security to implement regulations in order to make this workable. And I'm happy to answer any other questions that you all have on this case. But for all of the reasons in our briefing and for the reasons that we've discussed today, we would request that this Court affirm the District Court's decision finding no subject matter jurisdiction. Thank you. Thank you. I appreciate your argument. Do you have anything further, Counsel? One very short point on congressional acquiescence, which my colleague just raised. Congressional acquiescence is falling out of favor with the Supreme Court, first off. And second off, it requires you to point to something where Congress has actually identified this issue to acquiesce to. And the agency simply doesn't have that and can't point to that. So congressional acquiescence, while the Ninth Circuit kind of hinted at it, it did not base its decision on that. And I think the Ninth Circuit's decision, again, is best read as violating that tenet that policy concerns cannot trump the best reading of a statute. Because I do believe my plaintiffs here, my plaintiffs in other parts of the country have the best reading of the statute. And the policy concerns that my colleagues raise are fair, but they're irrelevant. And for that reason, Your Honors, we would ask you to vacate the lower court's decisions and rule in our favor. Thank you so much. Thank you. Thank you. We appreciate all the arguments in this case, and the cases are submitted for the day.